MAX W. LYNCH *v.* INDIANA STATE UNIVERSITY BOARD OF TRUSTEES

[No. 1-877A189. Filed August 2, 1978. Rehearing denied September 12, 1978.
Transfer denied January 12, 1979.]

*Stephen P. Sherron,* of Indianapolis, for appellant.

*Robert M. Kluchin, Bonnie A. Martinez, Karon, Morrison, & Savikas,* of Chicago, Illinois, *Cox, Zwerner, Gambill, & Sullivan,* of Terre Haute, for appellee.

LYBROOK, P.J. — Plaintiff-appellant Max W. Lynch (Lynch) brings this appeal from an adverse judgment in his action seeking reinstatement as an associate professor of mathematics at Indiana State University (I.S.U.). Lynch was terminated by the I.S.U. Board of Trustees as a result of his practice of reading aloud from the Bible at the beginning of each of his classes.[1] Lynch gave his students the opportunity to leave the room if they did not wish to hear the readings. Repeated efforts by I.S.U. to reach a mutually acceptable agreement concerning Lynch's Bible reading were unsuccessful and dismissal procedures were instigated. Lynch was thereafter dismissed from I.S.U.'s employ on February 18, 1974, and he then brought this action in the Superior Court of Marion

---

1. Lynch was employed by the University to teach high school mathematics at the University Laboratory School in Terre Haute.

County, which was subsequently venued to the Superior Court of Vigo County, contending that he was wrongfully discharged in violation of his constitutional right to free exercise of his religion.

I.S.U. filed a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted (Indiana Rules of Procedure, Trial Rule 12(B)(6)), which was treated by the trial court as a Motion for Summary Judgment pursuant to TR. 12(B) and TR. 56. From the granting of summary judgment in favor of I.S.U., Lynch brings this appeal.

On appeal, Lynch asserts that the trial court erred in granting summary judgment, in that:

(1)    The decision of the trial court is contrary to law in that Lynch's Bible reading was not in violation of his student's constitutional rights.

(2)'    The decision of the trial court is contrary to law in that Lynch's dismissal violated his constitutional rights under the First and Fourteenth Amendments of the U.S. Constitution and Article 1, Sections 2 and 3 of the Indiana Constitution.

It is well established that this court, when reviewing the granting of summary judgment, must determine if any genuine issue of fact exists, and whether the law was correctly applied by the trial court. *Hale v. Peabody Coal Company* (1976), 168 Ind. App. 336, 343 N.E.2d 316; *Middleton Motors v. Ind. Dept. of State Revenue, Gross Income Tax Division* (1977), Ind. App., 366 N.E.2d 226. The court will therefore consider all facts as alleged by the appellant to be true, and draw from those facts all reasonable inferences favorable to him. *Hale v. Peabody Coal Company, supra; Middleton Motors v. Ind. Dept. of State Revenue, supra.*

Under TR. 56(C), a summary judgment will be granted by the trial court where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits and testimony, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Here, no genuine issues of material fact exists as both parties agree Lynch was employed to teach mathematics at the University Laboratory

School at Terre Haute, which is operated by I.S.U. During the course of his employment, Lynch made a practice of reading Bible verses aloud to his mathematics students for several minutes at the beginning of each class hour. During several discussions between Lynch and I.S.U. officials, Lynch was admonished to cease his religious readings as the practice was violative of University policy and unlawful. At first Lynch agreed to discontinue the practice, but he subsequently informed I.S.U. officials that he intended to continue reading aloud from the Bible to his classes. I.S.U. advised Lynch that a Faculty Dismissal Hearing would be held to consider his dismissal, and that he had a right to prepare and present a defense. The Faculty Dismissal Hearing Committee recommended Lynch's dismissal, and Lynch requested consideration by the I.S.U. Board of Trustees, which voted to affirm Lynch's dismissal from the faculty.[2]

## I.

Lynch claims that the trial court erred in finding that the reading of Bible verses, without comment, to his students was a violation of the students' constitutional rights. It is his contention that so long as his students were accorded the opportunity to absent themselves from the classroom to avoid hearing the Bible reading, he has preserved or at least not infringed upon their rights.

Addressing an Illinois statute, which required religious instruction in the public schools, in the case of *McCollum v. Board of Education* (1948), 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649, the United States Supreme Court noted:

> "That a child is offered an alternative may reduce the constraint; it does not eliminate the operation of influence by the school in matters sacred to conscience and outside the school's domain. The law of imitation operates and non-conformity is not an outstanding characteristic of children. The result is an obvious pressure upon children to attend."

Justice Brennan, writing a concurring opinion in *Abington School District v. Schempp* (1963), 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844,

---

2. Lynch does not claim that the procedure followed by I.S.U. in terminating his employment was insufficient or improperly conducted.

had the following comments on a provision allowing students to be "excused" from religious instruction:

> "... by requiring what is tantamount in the eyes of the teachers and schoolmates to a profession of disbelief, or at least of nonconformity, the procedure may well deter those children who do not wish to participate for any reason based upon the dictates of conscience from exercising an indisputably constitutional right to be excused. Thus the excusal provision in its operation subjects them to a cruel dilemma. In consequence even devout children may well avoid claiming their right and simply continue to participate in exercises distasteful to them because of an understandable reluctance to be stigmatized as atheists or nonconformists simply on the basis of their request." (374 U.S. at 289-290, 83 S.Ct. at 1607).

For the students in his mathematics classes, the indisputable effect of Lynch's Bible reading was the advancement or promotion of Lynch's particular religious views and practices.[3] Peer pressure, fear of the teacher, concern about grades, and the alternative of standing outside the classroom in the hall, severely limit the freedom of a student to absent himself from class during a Bible reading. Additionally, Lynch's religious activity was being conducted while he was employed by the I.S.U. Board of Trustees, using public facilities, during class time.

We think that the alternative afforded Lynch's students to absent themselves from the classroom was not sufficient protection to their own constitutional rights in light of the supervisory position of control occupied by the teacher over student grading and conduct, coupled with peer pressure and disapproval which we feel would have a "chilling"

---

3. There is no dispute that the daily readings engaged in by Lynch were a religious activity. As the U.S. Supreme Court said in *Abington Township v. Schempp, supra*:

"The daily reading of [Bible] verses even without comment possess a devotional and religious character and constitutes in effect, a religious observance."

More recently in *Goodwin v. Cross County School District No. 7* (E.D. Ark. 1973), 394 F. Supp. 417,

"As to the religious character of the practice, there is no dispute. The defendants make no claim that the Bible is not an instrument of religion. The reading of verses from the Bible and recitation of the Lord's prayer is a ceremony of religious character which cannot be gainsaid."

effect at best and more likely, a coercive impact on the student's free exercise of their religious rights.

## II.

Next, Lynch asserts that the trial court's decision is contrary to law in that Lynch's dismissal violated his constitutional rights under the First and Fourteenth Amendments of the U.S. Constitution and Article 1, Sections 2 and 3 of the Indiana Constitution.

Lynch argues that I.S.U. has adopted a policy which is hostile to the free exercise of his religion in an area which is not proscribed by the Constitutions of the United States and the State of Indiana, thereby depriving Lynch of his employment based upon his religious beliefs.

Lynch cites *Torcaso v. Watkins* (1961), 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982, for the proposition that public positions cannot be withheld from persons because of their religious beliefs.[4] Here, I.S.U. maintains that Lynch was not discharged because of his religious beliefs but only for his refusal to cease the religious act of oral Bible reading during school time.

It is Lynch's contention that he is compelled by his religious beliefs to read from his Bible in mathematics class. He asserts that he was never informed that as a condition of his employment he could not exercise his beliefs, but was informed he could not read his Bible only subsequent to his employment.

The First Amendment to the U.S. Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."

The guarantees of the First Amendment have been extended and made applicable to the States by way of the Fourteenth Amendment. *Cantwell v. Connecticut* (1940), 310 U.S. 296, 60 S. Ct. 900, 84 L.Ed. 1213.

The Indiana Constitution provides in Article 1:

"§2. *Right to Worship.*—All men shall be secured to their

4. In *Torcaso*, a Maryland law was struck down because it required notary publics to sign an oath affirming belief in God.

natural right to worship Almighty God according to the dictates of their own consciences.

§3. *Freedom of Thought* — No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience.

§4. *No preference to any creed* — No preference shall be given, by law, to any creed, religious society, or mode of worship; and no man shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent."

Lynch claims that the termination of his employment as a school teacher by I.S.U. violated the First and Fourteenth Amendments by denying him free exercise of his religious beliefs where such exercise did not violate the rights of others.

The distinction between the extent of the First Amendment protection afforded religious *acts*, as opposed to *beliefs*, was made by Justice Roberts in the following widely quoted statement from *Cantwell v. Connecticut, supra*:

"The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship . . . On the other hand, it safeguards the free exercise of the chosen form of religion. *Thus the Amendment embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection.* In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. No one would contest the proposition that a State may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guarantee. *It is equally clear that a state may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment.*" (Emphasis added, 310 U.S. 303-304).

In the cases of *School District of Abington Township v. Schempp* and *Murray v. Curlett, supra,* and *Engel v. Vitale* (1962), 370 U.S. 421, the

U.S. Supreme Court held that the Establishment Clause of the First Amendment was violated by schools which engaged in daily Bible readings or prayer recitations, notwithstanding the fact that students who objected to the readings or prayers could be excused from their classrooms during the exercises. A fundamental holding of these and other Establishment Clause cases is the Supreme Court's recognition that the imposition of a limitation upon an individual's act or exercise of religious expression in a public school is not an infringement upon his right to hold his religious beliefs. The United States Supreme Court's decisions prohibiting regular Bible readings or prayers in schools did not affect the beliefs of the students, teachers and parents, who desired those religious exercises. The Court's decisions merely limited the times and places for conduct expressing those beliefs.

In the companion cases of *Jones v. City of Opelika, Bowden v. City of Fort Smith, Ark.,* and *Jobin v. State of Arizona* (1942), 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691, (vacated on other grounds, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1691), Justice Reed wrote for the U.S. Supreme Court:

"One man, with views contrary to the rest of his compatriots, is entitled to the privilege of expressing his ideas by speech or broadside to anyone willing to listen or to read. Too many settled beliefs have in time been rejected to justify this generation in refusing a hearing to its own dissentients. *But that hearing may be limited by action of the proper legislative body to times, places and methods for the enlightenment of the community which, in view of existing social and economic conditions, are not at odds with the preservation of peace and good order.*

This means that the proponents of ideas cannot determine entirely for themselves the time and place and manner for the diffusion of knowledge or for their evangelism, any more than the civil authorities may hamper or suppress the public dissemination of facts and principles by the people. The ordinary requirements of civilized life compel this adjustment of interests." (Emphasis added).

In order for the State to interfere with the practices of a legitimate religious belief, it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a State interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause. *Wisconsin v. Yoder* (1972), 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15.

To allow Lynch to exercise his freedom to act, here, in reading the Bible aloud to his students would impinge upon his students' freedom to believe as they wish. Under the rule in *Cantwell*, which was reaffirmed in *Torcaso*, the concept of freedom to believe is an absolute right, and the freedom to act, in the nature of things, cannot be absolute. Thus when the exercise of his religious acts impinges upon the rights of his students to believe, then Lynch's rights must fall. A man cannot extend his religious freedom until it infringes upon another person's civil rights or constitutional liberties. The right to worship is not a right to disturb others in their worship.

Lynch was not discharged from I.S.U.'s employment because of his religious beliefs, but was terminated because of his activities of reading aloud from the Bible before each of his mathematics classes. Lynch was not deprived of his right to read aloud from the Bible before and after school at his home, in church and with friends. The record shows that I.S.U. advised Lynch that he must not consume the limited and valuable classroom time available for teaching mathematics by reading the Bible. This I.S.U. unquestionably had the right to do in order for the University to maintain religious neutrality and promote secular education.

IC 1971, 20-12-1-2, enumerates the powers of the boards of trustees of the universities of the State of Indiana, which include the power and duty:

"(a)    To govern the disposition and method and purpose of use of the property owned, used or occupied by the institution, including the governance of travel over and the assembly upon such property;

(b)    *To govern, by specific regulation and other lawful means, the conduct of students, faculty, employees and others while upon the property owned by or used or occupied by the institution;*

(c)    *To govern, by lawful means, the conduct of its students, faculty and employees, wherever such conduct might occur, to the end of preventing unlawful or objectionable acts which seriously threaten the ability of the institution to maintain its facilities available for performance of its educational activities* or which are in violation of the reasonable rules and standards of the institution designed to protect the academic community from unlawful conduct or conduct which presents a serious threat to person or property of the academic community;

(d)   To dismiss, suspend or otherwise punish any student, faculty member or employee of the institution who violates the institution's rules or standards of conduct, after determination of guilt by lawful proceedings;

* * *

(g)   To prescribe the curricula and courses of study offered by the institution and to define the standards of proficiency and satisfaction within such curricula and courses; . . ." (Emphasis added).

Pursuant to the statutory exercise of power to specify curriculum in the schools and to regulate the conduct of the faculty, the I.S.U. official and Board of Trustees first employed Lynch to teach mathematics and subsequently dismissed him from the faculty.

In *Stein v. Oshinsky* and *Rubin v. Board of Regents*, companion cases decided in 1965 by the U.S. Court of Appeals, Second Circuit, (1965), 348 F.2d 999, Judge Friendly considered the defendants' proposition that the First Amendment would not prohibit the school authorities from permitting student initiated prayers, saying:

"Nevertheless New York is not bound to allow them unless the Free Exercise Clause or the guarantee of freedom of speech of the First Amendment compels.

Neither provision requires a state to permit persons to engage in public prayer in state-owned facilities wherever and whenever they desire. *Poulos v. State of New Hampshire*, 345 U.S. 395, 405, 73 S.Ct. 760, 97 L.Ed. 1105 (1953). It would scarcely be argued that a court had to suffer a trial or an argument to be interrupted any time that spectators — or even witnesses or jurymen — desired to indulge in collective oral prayer. The case of the school children differs from that of spectators — although not from that of witnesses or jurymen — in that, so long as they choose to attend a public school, attendance on their part is compulsory. N.Y. Education Law, Consol. Laws, c. 16, §§ 3201-3229. But '[t]he student's compelled presence in school for five days a week in no way renders the regular religious facilities of the community less accessible to him than they are to others.' *Abington Tp. School District v. Schempp, supra*, 374 U.S. at 299, 83 S.Ct. at 1612 (Concurring opinion of Mr. Justice Brennan). . . .

*Determination of what is to go on in public schools is primarily*

*for the school authorities. Against the desire of these parents that their children 'be given an opportunity to acknowledge their dependence and love to Almighty God through a prayer each day in their respective classrooms, the authorities were entitled to weigh the likely desire of other parents not to have their children present at such prayers, either because the prayers were too religious or not religious enough; and the wisdom of having public educational institutions stick to education and keep out of religion, with all the bickering that intrusion into the latter is likely to produce. The authorities acted well within their powers in concluding that plaintiffs must content themselves with having their children say these prayers before nine or after three*; their action presented no such inexorable conflict with deeply held religious belief as in *Sherbert v. Verner*, supra. After all that the states have been told about keeping the 'wall between church and state * * * high and impregnable,' *Everson v. Board of Education*, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947), it would be rather bitter irony to chastise New York for having built the wall too tall and too strong." (Emphasis added).

Lynch's contention that the First and Fourteenth Amendment proscribe only *legislation* in respect to religion must also fall, as the Federal Courts have interpreted their language to forbid voluntary student initiated prayers and Bible readings even in the absence of state statutes or regulation. See *American Civil Liberties Union v. Gallatin Area School District* (W.D. Pa. 1969), 307 F. Supp. 637, where the resolution of a school board authorizing Bible reading and encouraging group recitation of the Lord's Prayer, was held to the act of a political subdivision of a state government and hence violative of the Establishment Clause. Later in *Goodwin v. Cross County School District No. 7* (E.D. Ark. 1973), 394 F. Supp. 417, the Federal Court considered three religious activities challenged by petitioner Goodwin. While it upheld the participation of local clergy in baccalaureate services because such services were not held on a school day nor was student attendance required, the Court found that a voluntary, student initiated program of Bible reading and recitation of the Lord's Prayer along with a program for distribution of Gideon Bibles in the school system, were clearly of religious character violative of the Establishment Clause where the programs used tax-supported facilities and took advantage of compulsory public school attendance, all with the permission of school authorities.

For the State of Indiana or I.S.U. to have ordered Lynch or his students to participate in religious activities would clearly have violated the Establishment Clause of the U.S. Constitution's First Amendment, as well as Article 1, § 2 of the Indiana Constitution, both set out above. The oft-quoted admonition from *Everson v. Board of Education* (1947), 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, bears repeating:

"Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities, or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' (330 U.S. at 15-16, 67 S.Ct. at 511-512). . . ."

The Supreme Court again reaffirmed its position in *Epperson v. Arkansas* (1968), 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228, where Justice Fortas wrote:

"Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of non-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." 393 U.S. at 104, 89 S.Ct. 270.

The Establishment Clause, then, stands at least for the proposition that when government activities touch on the religious sphere, they must be secular in purpose, evenhanded in operation, and neutral in primary impact. *Abington School District v. Schempp, supra; Gillette v. U.S.* (1971), 401 U.S. 437, 91 S.Ct. 828.

While the State has not directly participated in the act of Bible reading by Lynch, it placed him in the position of authority from which he might

express his religious views during a part of the curricular day, involving young people whose presence is compelled by law, hence utilizing the prestige, power, and influence of school authority.

Thus had I.S.U. permitted Lynch to continue the Bible readings, it would have violated its religious neutrality mandated by the Establishment Clause of the First Amendment, allowed infringement upon the religious freedoms of its students, and failed to promote the secular goal of instruction in mathematics for which Lynch was employed. The I.S.U. Board of Trustees was justified in acting, pursuant to IC 1971, 20-12-1-2, to discharge Lynch after his refusal to cease his religious activities in the classroom.

Finding no genuine issue of fact, we affirm the trial court's award of summary judgment in favor of I.S.U.

Affirmed.

Buchanan, C.J., participating by designation, concurs.

Lowdermilk, J., concurs.

NOTE — Reported at 378 N.E.2d 900.