Kenneth E. **LANGLOTZ**, Jr., Plaintiff,

v.

Vincent M. **PICCIANO** and Joseph **Fedeli**, Defendants.

Civ. A. No. 87–0777–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

April 12, 1988.

**1042**

William M. Beeton, Jr., Fairfax, Va., for plaintiff.

Edward E. Rose, III and Susan B. Potter, Asst. Co. Attys., Fairfax, Va., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I. INTRODUCTION

This is a 42 U.S.C. § 1983 action in which plaintiff claims that defendants[1] unlawfully discharged him from his position as an outreach counselor for the Fairfax County Juvenile and Domestic Relations District Court in retaliation for the exercise of his First Amendment rights. Specifically, plaintiff contends that defendants infringed his rights to free exercise of religion and freedom of speech when they reprimanded him for using a "Christian Perspective"[2] with one of his clients and later forced him to resign because of his written response to the reprimand.

The parties waived a jury and the matter was tried to the Court on January 13 and 14, 1988. Seven witnesses testified and following the trial, the parties filed briefs. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

### II. FINDINGS OF FACT

1. Plaintiff, Kenneth Langlotz, was hired in December, 1977 to serve as an outreach counselor for the Fairfax County Court Services Unit (the Services Unit), the administrative arm of the Fairfax County Juvenile and Domestic Relations District Court (Juvenile Court). In February, 1986, plaintiff resigned from his employment with the Services Unit.

2. At all relevant times, defendant Vincent Picciano was the Director of Court Services for the Services Unit. In this capacity, Picciano exercised general supervisory responsibility over the Services Unit under the direction of the Chief Judge of the Juvenile Court. The Chief Judge is the ultimate hiring and firing official for the Services Unit.

3. At all relevant times, defendant Joseph Fedeli was the Director of Residential Services for the Services Unit. Fedeli was also plaintiff's immediate supervisor at the time plaintiff resigned.

4. The Services Unit receives complaints from parents, children and the police, does social investigations for the Juvenile Court, provides probation supervision and counseling for juveniles, and operates the juvenile detention center, group homes, probational services and other residential services for juveniles. Many of the juveniles who come into contact with the Juvenile Court have emotional problems.

---

1. In addition to the two current defendants, Michael J. Valentine, Chief Judge of the Fairfax County Juvenile and Domestic Relations Court, was originally named as a defendant, but was subsequently dismissed. *Langlotz v. Valentine, et al.,* No. 87–0777–A (Nov. 13, 1987).

2. This phrase was defined during trial to encompass the dogma of the Old and New Testaments, including a belief in the divinity of Christ.

5. For the first several years of his employment, plaintiff satisfactorily performed his duties as an outreach counselor.

6. In late 1983, plaintiff separated from his wife. From that point on, his job performance deteriorated markedly.

7. Michael J. Valentine, Chief Judge of the Juvenile Court since April, 1984, and formerly a Juvenile Court judge, testified that he began to have concerns about plaintiff in the fall of 1983. Plaintiff frequently approached Judge Valentine at work to talk about his marital problems.

8. When Judge Valentine became the Chief Judge and began to have meetings with defendant Picciano, he became aware that other Juvenile Court employees were concerned about plaintiff's behavior.

9. In the spring of 1984, after a conversation with plaintiff at a restaurant, defendant Picciano grew concerned that plaintiff was having personal problems which were affecting his ability to do his job.

10. Picciano then called a meeting with Frank Pitts, then Deputy Director of Court Services, Fedeli and Keith True, plaintiff's direct supervisor at the time. The memorandum memorializing the meeting records True's report that plaintiff's distress over the breakup of his marriage had become so severe that True and others had recommended that plaintiff see a therapist. True thought plaintiff had followed this recommendation. Additionally, True stated that plaintiff discussed his marital problems with everyone, including the judges. The memorandum states that in January, 1984, plaintiff went to see Judge Bach, the circuit court judge who was handling his pending divorce case, to talk about his case. Judge Bach expressed concern to Judge Fortkort, then Chief Judge of the Juvenile Court, about this manifestly inappropriate behavior.

11. At the meeting, Pitts reported that plaintiff had inappropriately tried to intervene when a student at Lake Braddock High School took hostages. This occurred after Pitts had instructed plaintiff not to interfere. According to Fedeli, plaintiff had threatened to arrest a Robinson High School secretary for not acting quickly enough to provide him with information. On the basis of this information, the group decided that plaintiff's future behavior should be closely monitored and that plaintiff should be given written instructions concerning how to conduct himself in the future.

12. In May, 1984, Lee McCormack became plaintiff's direct supervisor. In two memoranda to True dated July 31, 1984, McCormack noted several problems with plaintiff's performance. The principal area of concern was that plaintiff was continuing to use a philosophy which he called "The Force," based on the Star Wars films, to counsel juveniles, despite repeated directives not to use this approach. McCormack received reports from other staff members that one of plaintiff's juvenile clients had ridiculed plaintiff's discussions of the "The Force" and described plaintiff as weird. When McCormack directed plaintiff to cease talking to clients about "The Force," plaintiff flatly refused and accused McCormack of violating his free speech rights. Because of plaintiff's agitated behavior, McCormack called True into the office. True advised plaintiff that his behavior might be cause for termination. Plaintiff later agreed to cease talking about "The Force." Subsequently, plaintiff told McCormack that he, plaintiff, was in a "war with the devil" and that his problems were occurring because he was an "agent of God."

13. McCormack also noted that plaintiff had discussed an incident with her that caused her to entertain grave doubts about the soundness of his judgment. Plaintiff related to McCormack that he had intervened in a car chase involving two other vehicles. A passenger in one vehicle had made an obscene gesture to the occupants of a second vehicle. The driver of the second vehicle then began chasing the first vehicle. Plaintiff decided to join the chase and eventually all vehicles stopped at the side of the highway. When the passengers of the other vehicles, two of whom were armed with pipes, got out of their cars, plaintiff approached them and was purport-

edly able to dissuade them from violence by telling them to "go with The Force." Plaintiff viewed his actions as appropriate, indeed mandated, in light of his role as a probation officer with the Juvenile Court.

14. Also in a July 31, 1984 memorandum, True notified plaintiff that he had a number of concerns regarding plaintiff's job performance. True listed plaintiff's refusal to stop using "The Force" philosophy, as well as the Judge Bach, Lake Braddock and Robinson High School incidents. He also expressed concern that plaintiff had rejected supervision and that his personal problems were interfering with his judgment and job performance. Plaintiff received an official reprimand and was instructed, *inter alia*, to get a psychiatric evaluation and to cease using "The Force" philosophy with clients and staff.

15. In September, 1984, McCormack received a report from the director of the probation unit and a probation officer that described an incident in which plaintiff allegedly acted inappropriately. According to the report, plaintiff interceded at a detention hearing in which he was not involved and had no responsibility to argue that a juvenile should be released. Plaintiff was neither formally assigned to the case, nor had he had any prior consultation with the probation officer assigned to the case. McCormack concluded that this behavior exceeded the bounds of plaintiff's proper role and demonstrated unacceptably poor judgment.

16. On October 11, 1984, Picciano requested that plaintiff undergo a psychiatric evaluation. The evaluating physician found that while plaintiff was not self destructive or dangerous, his condition could "affect his ability to deal with others with emotional problems. His unrealistic ideas, impaired judgment and limited insight may make it difficult for him to perform the job of outreach counselor effectively."

17. In his October 30, 1984 performance rating, McCormack gave plaintiff a rating of 1.3 out of a possible 4. This rating placed plaintiff's job performance in the "conditional" category.[3] Picciano testified that he could not recall any other court employee ever receiving a rating that low.

18. In memoranda attached to the performance rating, McCormack commented that plaintiff's case presentations relating to his clients had been "vague, unclear, rambling, and had very little substantive content." She also advised plaintiff to "[r]efrain from talking to clients or their families about your personal philosophies."

19. In January, 1985, McCormack gave plaintiff a 1.77 performance rating, which again placed plaintiff's performance in the conditional range.

20. In July, 1985, plaintiff received a performance rating of 2.12. This rating meant that plaintiff's job performance was "satisfactory" and made him eligible for a merit pay increase. In comments attached to the performance evaluation, however, McCormack noted a number of areas of concern. She wrote that plaintiff's case notes continued to be unsatisfactory. Additionally, while plaintiff had done "a relatively good job in keeping his personal philosophies apart from his job," he had described a conversation he had had with a client's parents in which he had urged them to "resolve their problems by turning their lives over to God." McCormack suggested that plaintiff could be more effective by focusing on concrete problems, rather than by expounding on matters of faith.

21. Plaintiff testified in ambiguous terms that True and McCormack instructed him at this time not to have religious counseling sessions with parents and clients. McCormack, however, stated that while she did not specifically prohibit plaintiff from using religion in counseling clients, she certainly sought to discourage him from doing so. She attempted to persuade plaintiff that he could be more effective if he focused on solving concrete problems. Picciano testified that it was his impression that while plaintiff was told not to use his personal philosophies in counseling to the det-

---

3. A conditional rating is the second lowest rating an employee can receive and renders an employee ineligible for an annual merit pay increase. The lowest rating is "unsatisfactory." Picciano stated that a conditional rating indicates marginal job performance.

riment of his clients, he was not specifically forbidden from using the Christian Perspective. Judge Valentine testified that the Court had no formal guidelines concerning use of religion in counseling.

22. It appears that although plaintiff was strongly and repeatedly discouraged from bringing his personal religious philosophies and beliefs into his discussions with clients, he was never explicitly prohibited from using religion in counseling. It was made clear to him, however, that the use of religious counseling was inappropriate and ineffective in the Juvenile Court context and that it should be avoided.

23. In her July, 1985 report, McCormack also related an incident in which plaintiff had yelled at her after she criticized him, causing a coworker to become concerned about her safety.

24. Picciano testified that he and Judge Valentine were concerned that plaintiff's "satisfactory" rating in July, 1985 was not accurate in light of the numerous negative comments McCormack had made about plaintiff's performance. Plaintiff, on the other hand, believed that the rating was too low. Plaintiff met with Picciano and Fedeli to discuss the rating. Picciano and Fedeli agreed to review and recompute the rating, but Picciano cautioned plaintiff that, as a result, the rating could go down as well as up.

25. McCormack testified that shortly after his July, 1985 rating, plaintiff again disobeyed one of her directives. A staff worker called her after visiting one of plaintiff's clients and told her that the client's father had said that he did not want plaintiff around his child. McCormack called plaintiff and told him not to contact the father until she had discussed the problem with the family. Plaintiff, however, ignored this directive and called the father.

26. In September, 1985, plaintiff arrived at a staff meeting late and began speaking incoherently. He made repeated references to God and talked about people shooting bullets at him. McCormack terminated the meeting early because of apprehension about plaintiff's behavior. As a result of this incident, Picciano requested that plaintiff undergo a second psychiatric evaluation.

27. A staff psychologist at the Woodburn Center for Community Mental Health reported that plaintiff was suffering from symptoms consistent with a manic-depressive disorder, which at that time appeared to be in remission. The psychologist posited "major depression with psychotic and manic features" as an alternative diagnosis. Additionally, plaintiff was diagnosed as having a "mixed personality disorder with histrionic, paranoid, narcissistic and avoidant features." A Woodburn Center psychiatrist confirmed the psychologist's diagnosis of a manic-depressive disorder with an underlying mixed personality disorder. She also concluded that plaintiff's mental state did affect his ability to accept and respond to supervision and that it may well have affected his ability to counsel juveniles.

28. In December, 1985, as a result of the reassessment requested by plaintiff, his July, 1985 performance rating was changed to a rating of 2, making him ineligible for a merit increase. The primary problem noted with his performance was his failure to develop adequate counseling skills, despite seven years of experience and intensive supervision.

29. McCormack testified that during this period, plaintiff was not amenable to her supervision. She also stated that plaintiff's behavior put her in fear of her personal safety. At a Christmas party in 1985, for instance, plaintiff approached McCormack and said menacingly, "Merry Christmas, you evil witch."

30. In late December, 1985, Fedeli became plaintiff's direct supervisor.

31. In January, 1986, events occurred which led to plaintiff's receipt of another reprimand. On January 17, 1986, Fedeli received a call from Trudi Bell of the School for Contemporary Education relating to Angela Chamberlin, one of plaintiff's assigned clients. Bell recounted an episode in which something plaintiff had said seriously upset Chamberlin. As it happened, Chamberlin had missed the school bus and

plaintiff had given her a ride to school. On the way to school, static interfered with the reception of a religious radio station to which plaintiff had been listening. Plaintiff then stated to Chamberlin that the devil was causing the static on the radio. Bell informed Fedeli that Chamberlin had expressed confusion over this statement at school. Fedeli also received a call from West Johnson, Chamberlin's probation counselor. Johnson, who had learned of the incident, asked that plaintiff be taken off the case. Fedeli and plaintiff subsequently met with Bell to discuss the incident.

32. At trial, plaintiff confirmed the essence of this episode. He testified that on the way to school, he and Chamberlin were listening to a Christian radio station. When static came over the radio, plaintiff likened the static to the devil, turned the radio off, and stated to Chamberlin that turning away from the static was like turning to the Lord. Plaintiff stated that he knew at that time that Chamberlin was prone to "emotional outbursts." Other testimony confirmed that the remark upset Chamberlin and led to later emotional turmoil at school.

33. Plaintiff admitted that it was his practice to use a "Christian Perspective" in counseling when the client or his or her family seemed receptive to it. According to plaintiff, Chamberlin's mother had asked him to take a Christian Perspective with her daughter. However, Chamberlin's mother, Elaine Slauser, testified that plaintiff asked her whether she minded if he talked to the child about Christianity. The Court finds that it was plaintiff who initiated the idea of taking a Christian Perspective in counseling Chamberlin.

34. Upon learning of the Chamberlin incident, Judge Valentine concluded that plaintiff's employment should be terminated. He testified that in his opinion, plaintiff had demonstrated bizarre behavior and that this incident was the "final straw." Picciano added that plaintiff's superiors believed that his discussion with Chamberlin about the Lord and the devil was an inappropriate use of his time and had not ad-dressed the child's problems. Picciano, however, recommended that plaintiff be given a letter of reprimand, and Judge Valentine reluctantly agreed. Fedeli was directed to write the letter.

35. The letter of reprimand, dated January 27, 1986, sets forth the information which Fedeli received from Bell and Johnson and states that Bell "felt strongly that this comment to [Chamberlin], who has been diagnosed as emotionally disturbed, was inappropriate.... Similar occurrences in the future could result in a recommendation that more severe disciplinary action be initiated." Fedeli testified that in writing the letter of reprimand, his concern was with the effect plaintiff's counseling technique had had on Chamberlin, rather than with plaintiff's religious beliefs. Fedeli also stated that he believed it was his responsibility to insure that plaintiff's religious beliefs were not imposed on clients. Additionally, Fedeli recalled instructing plaintiff not to impose his religious philosophies on others and to develop more acceptable counseling approaches and methodologies.

36. Plaintiff responded to the reprimand in a handwritten letter dated January 30, 1986. In the letter, plaintiff accused Fedeli and others of employing an "abusive discriminating style of management," of ruining his life, marriage and career, of violating his constitutional rights of freedom of speech and religion, of robbing Chamberlin of the opportunity "of having her perspective developed from a Christian perspective," and of crucifying "the word and intention of the Lord as it was acting through [plaintiff] as a counselor." Plaintiff suggested that the outreach staff be placed under a Christian supervisor and that a complete investigation be initiated into the employment practices of the Juvenile Court. The final page of the letter indicates that plaintiff sent copies of the letter to, *inter alia*, Pope John Paul, President Reagan, John Herrity, then Chairman of the Fairfax County Board of Supervisors, the *Washington Post* and Billy Graham. Plaintiff also enclosed a number of excerpts from a book on religious subjects.

37. After receiving the letter, both Judge Valentine and Picciano agreed that plaintiff's employment should be terminated. Picciano testified that while the response triggered plaintiff's termination, it was by no means the sole or principal cause; rather, it was just "the straw that broke the camel's back," the culmination of a long series of troublesome performance problems. Both Judge Valentine and Picciano stated that it was not the religious content of letter which disturbed them, but plaintiff's insistence on blaming others for his problems, his continued refusal to accept supervision and the lack of judgment reflected in the letter. Judge Valentine and Picciano considered transferring plaintiff to a position in which he would not have contact with juveniles. Ultimately, however, they concluded that no such positions existed. Picciano suggested to Judge Valentine that plaintiff be given the option to resign, and Judge Valentine agreed. Fedeli was instructed to inform plaintiff of the decision.

38. On February 5, 1986, Fedeli called plaintiff while plaintiff was on vacation in Texas to inform him that he would either have to resign or be discharged. In a letter dated February 13, 1986, plaintiff resigned from his position. Subsequently, plaintiff attempted to withdraw his resignation. Judge Valentine instructed Picciano not to accept the withdrawal, and accordingly, in a letter dated March 3, 1986, Picciano informed plaintiff that he would not be permitted to withdraw his resignation.

39. The cause of plaintiff's termination was his deteriorating performance since 1983. Specifically, he had repeatedly demonstrated poor judgment and an unwillingness to accept, and respond to, supervision. As result of several untoward incidents involving juvenile clients, their families and his coworkers, plaintiff had received poor performance ratings and two formal reprimands. His stubborn insistence upon injecting his religious views into his counseling, against the wishes of his superiors, caused problems with juvenile clients and their families and led his superiors to have grave concerns about plaintiff's judgment and suitability for the job. Defendants did not object to any political or religious views reflected in the January 30 letter, nor did they terminate plaintiff for holding or expressing such views. Rather, defendants viewed certain aspects of the letter, including its bizarre effort to send copies to public figures, as confirming plaintiff's lack of judgment, lack of insight into his behavior and unsuitability to work with emotionally disturbed youngsters.

## III. CONCLUSIONS OF LAW

### A. *Free Exercise of Religion*

Plaintiff contends that his forced resignation[4] was triggered by official intolerance of his use of a Christian Perspective in counseling. This action, he argues, vio-

---

**4.** Defendants urge the Court to find that plaintiff voluntarily resigned and therefore has no claim against defendants. They cite *Jurgensen v. Fairfax County,* 745 F.2d 868 (4th Cir.1984), for the proposition that because plaintiff resigned and because his action was not the product of duress sufficient to void his resignation, he is therefore not entitled to reinstatement or damages under 42 U.S.C. § 1983. *Jurgensen* is distinguishable. There, the Fourth Circuit emphasized that it was the employee who initiated discussions on the discipline to be imposed for his misconduct. *Id.* at 890. He was told that he might receive anything from a demotion to termination. After a conference with his superiors, the *Jurgensen* plaintiff agreed in writing to a voluntary demotion. *Id.* at 876–77. His attempt to rescind this agreement was rejected. The court characterized the demotion as a "settlement." *Id.* at 890. In essence, the court found that plaintiff was presented with a realistic choice between (i) accepting a voluntary demotion as final and (ii) receiving discipline and then pursuing his rights through the Civil Service Commission. *Id.*

The instant case is in sharp contrast. Here, when Fedeli called plaintiff, plaintiff's termination was a fait accompli. Plaintiff had no realistic choice. He was allowed the option of resigning simply as a matter of grace. There was nothing voluntary about plaintiff's resignation; there was no bargain struck between plaintiff and defendants. Whether plaintiff chose resignation or termination, his employment was over. In *Jurgensen,* however, the discipline to be imposed was undetermined at the time plaintiff chose to be demoted. The plaintiff there was betting he could avoid termination by accepting a voluntary demotion. *Jurgensen* is therefore inapplicable here.

lated his First Amendment right to free exercise of religion. He claims he was forced, in essence, to choose between his job and his strongly-held religious beliefs. He also contends that defendants should have accommodated his religious beliefs by screening his case load to determine which clients would be receptive to plaintiff's religious approach.

■ Plaintiff's claims must be rejected. Even assuming that defendants prohibited plaintiff from using a Christian Perspective in counseling, the Juvenile Court would have been justified in placing such a prohibition on plaintiff and in terminating him if he violated the prohibition. While plaintiff's right to hold religious beliefs is absolute, his freedom to act on those beliefs is not. Rather, plaintiff's conduct is subject to governmental regulation for the protection of society. *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).[5] The Juvenile Court took no action against plaintiff because of his beliefs; it was his conduct, which plaintiff alleges was required by his beliefs, that triggered disciplinary action.

■ The free exercise rights of plaintiff *qua* individual may be absolute, but the free exercise rights of plaintiff *qua* state employee are not unconditional. They must be balanced against the state's responsibilities to avoid Establishment Clause violations and to protect the religious beliefs of others. Thus, in *Spratt v. County of Kent,* 621 F.Supp. 594 (W.D.Mich.1985), *aff'd,* 810 F.2d 203 (6th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1574, 94 L.Ed.2d 766 (1987), the district court rejected a free exercise challenge to the dismissal of a prison social worker who insisted on treating inmates by "spiritual means."

In a well-reasoned discussion, the court noted that:

> Administrators of public institutions, such as schools and prisons, are required to balance the first amendment rights of their employees to freely exercise their religions against the first amendment's prohibition on the "establishment" of religion and against the free exercise rights of other individuals.
>
> ... When ... exercise of an individual's first amendment rights potentially violates free exercise rights of others or the mandates of the establishment clause, the individual's rights are not absolute.... On the facts of this case, the Court concludes that plaintiff's constitutional right to the free exercise of his religion does not go so far as to permit him to use religious counseling methods against the orders of his superiors.

*Id.* at 600–01 (citations omitted).[6] This Court reaches the same result; it strikes the same balance as that struck in *Spratt.* Plaintiff's free exercise rights in this context, if any, are clearly outweighed by the Juvenile Court's compelling interests in avoiding Establishment Clause violations and protecting the First Amendment rights of clients and families with whom plaintiff has contact. *See Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).

The record does not reveal whether plaintiff forced his religious beliefs on juveniles he counseled. It does reflect, however, that he initiated Christian Perspective counseling in a number of instances. He insisted on his right to use this form of counseling despite his supervisors' strong suggestions that he refrain from injecting his religious views into his counseling sessions. His counseling methods plainly

---

**5.** *See also Baz v. Walters,* 782 F.2d 701, 708 (7th Cir.1986) (Veterans Administration chaplain "has no absolute right to conduct religious services and offer religious counsel in a government institution"); *O'Malley v. Brierley,* 477 F.2d 785, 793 (3d Cir.1973) (priests have no absolute right under First Amendment to enter a prison to conduct religious services and counseling).

**6.** *Fink v. Board of Educ. of the Warren County School Dist.,* 65 Pa.Commw. 320, 442 A.2d 837, 842 (1982) (where public school teacher's right

to free exercise of religion conflicted with establishment clause, establishment clause must prevail), *appeal dismissed,* 460 U.S. 1048, 103 S.Ct. 1493, 75 L.Ed.2d 927 (1983); *Lynch v. Indiana State Univ. Bd. of Trustees,* 177 Ind.App. 172, 378 N.E.2d 900, 908 (1978) (dismissal of professor for reading Bible aloud at the beginning of his mathematics classes upheld), *cert. denied,* 441 U.S. 946, 99 S.Ct. 2166, 60 L.Ed.2d 1048 (1979).

presented a danger that his beliefs would impinge on the beliefs of others. *See Spratt,* 621 F.Supp. 594, 601. Such a danger was far from imaginary, given plaintiff's position of trust and especially given that his clients, all of whom were young and many of whom were troubled, were a captive, impressionable audience. *See Lynch v. Indiana State Univ. Bd. of Trustees,* 177 Ind.App. 172, 378 N.E.2d 900, 903, 908 (1978).

Additionally, plaintiff's use of a Christian Perspective poses grave Establishment Clause problems. The Juvenile Court, as a state government institution, has a duty to ensure that its employees, in their roles as state employees, do not encourage or promote one religion over other religions or any religion over non-religion. *See Everson v. Board of Education,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–512, 91 L.Ed. 711 (1947); *Baz v. Walters,* 782 F.2d 701, 709 (7th Cir.1986); *Lynch,* 177 Ind.App. 172, 378 N.E.2d 900, 908. Allowing plaintiff to use the Christian Perspective may result in a violation of this duty.

Plaintiff's suggested means of accommodating his religious beliefs vividly illustrates the extent to which allowing the use of religious counseling would impermissibly entangle the Juvenile Court in religion. *See Lemon v. Kurtzman,* 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971); *Hall v. Bradshaw,* 630 F.2d 1018, 1019, 1021–22 (4th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981). Plaintiff asserts that the Juvenile Court should have screened cases to determine which clients and families were willing to receive Christian Perspective counseling. Only a moment's reflection confirms the inappropriateness of plaintiff's suggestion. It would compel the Juvenile Court to ascertain, and presumably accommodate, the religious beliefs of juveniles and their families. It would also, presumably, require the Juvenile Court to provide religious counseling from the perspective of myriad other religions and sects, including Islam, Buddhism, Taoism, Hinduism, Confucianism, Shintoism, and so on almost *ad infinitum.* Surely this would invite an Establishment Clause attack as favoring religion over non-religion, or as favoring some religions, i.e., those included, over others, i.e., those omitted. In sum, plaintiff's contention that he had the constitutional right to use a Christian Perspective collides fatally with the First Amendment's Establishment Clause.[7]

## B. *Freedom of Speech*

Plaintiff contends that his discharge is invalid because it was retaliation for the legitimate exercise of his free speech rights. In *Daniels v. Quinn,* 801 F.2d 687 (1986), the Fourth Circuit set forth a three-part test for analyzing claims of public employees who allege that they have been retaliated against for the exercise of their First Amendment rights:

> The first step is to ask whether the speech was about a matter of legitimate public concern....
>
> If the speech was about a matter of public concern, the question becomes whether the employee would have been discharged "but for" the speech. The defendant-employer will not be liable if the discharge would have occurred for other reasons, such as the plaintiff's own incompetence.... The employee bears the burden of demonstrating that protected speech was a motivating factor in the discharge. The burden then shifts to the employer to show that it would have reached the same decision even in the absence of the protected conduct....

7. But, of course, this does not mean that the First Amendment would preclude plaintiff from using, in secular form, the various ethical and normative precepts espoused by various religions. Thus, in their secular form, the golden rule, the injunction to honor and obey one's father and mother, the stricture against murder, theft and bearing false witness and other similar precepts may all be effectively employed in counseling Juvenile Court clients without running afoul of the First Amendment. The problem arises when these sorts of precepts are not used in their secular form, but are instead used, as plaintiff would urge, in conjunction with religious dogma such as a belief in God, the divinity of Jesus, the devil and a judgment at a second coming. Divorced from religious dogma, however, the use of normative or ethical precepts associated with various religions does not offend the Establishment Clause.

If protected speech was the "but for" cause of the discharge, courts must still inquire whether the degree of public interest in the employee's statement was nonetheless outweighed by the employer's responsibility to manage its internal affairs and provide "effective and efficient" service to the public. If so, then the employer will not be liable.

*Id.* at 689–90 (citations omitted). Plaintiff here claims that his written response to the letter of reprimand dealt with matters of public concern, that he would not have been fired but for the protected speech, and that the government's interest in providing effective and efficient service to the public did not outweigh the public's interest in plaintiff's statement. Defendants respond that plaintiff's argument fails at each step.

The proposition that plaintiff's letter dealt with a matter of public concern is untenable. To be sure, allegations of discriminatory employment policies are typically held to be a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). Plaintiff's letter, however, contains not the usual claims of discriminatory employment policies, but a demand that a public institution, in essence, commit an Establishment Clause violation to accommodate an employee's religious beliefs. No decision supports elevating such a demand to the level of public concern.

Moreover, most of plaintiff's letter is devoted to defending his actions in connection with the Chamberlin incident, certainly a matter of only private, not public, concern. Further, although plaintiff complains that he has been the victim of a "discriminating" style of management and that his constitutional rights have been violated, the letter does not indicate that any other employee has been subjected to such treatment. *See Lipsey v. Chicago Cook County Criminal Justice Comm'n,* 638 F.Supp. 837, 842 (N.D.Ill.1986) (plaintiff's allegations that supervisor was racially biased, made during the course of a salary dispute, did not deal with a matter of public concern). Thus, the letter is more a statement of a personal employment grievance than it

is a statement on matters of public concern. Plaintiff appears to have been speaking "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

Beyond this, however, plaintiff's free speech claim must also fail because he has not proved that the letter, even if it contained protected matters of public concern, was a motivating factor in his termination. Plaintiff, therefore, cannot satisfy the second part of the *Daniels* test. The content of the letter was not a motivating factor in plaintiff's discharge. Rather, the cause of plaintiff's termination was his deteriorating performance since 1983, including repeated disturbing incidents reflecting plaintiff's lack of judgment, unwillingness to accept and follow his supervisors' instructions and his unsuitability to counsel emotionally troubled young people. The January 30 letter was merely another piece of confirmatory evidence.

Since the fall of 1983, plaintiff's performance had been unacceptably poor. He had received less than satisfactory performance ratings, had received two formal reprimands and had on a number of occasions demonstrated poor judgment and emotional instability. Despite many years of experience and intensive supervision, plaintiff's counseling skills had not improved. He continued to use his personal religious philosophy in counseling despite strong encouragement from his supervisors to focus on concrete problems and develop other counseling techniques. In two psychiatric evaluations, plaintiff's ability to work effectively with emotionally disturbed young people was questioned. Although plaintiff was given many opportunities to improve his performance and explicit directions as to how to go about doing so, plaintiff consistently blamed his problems on others instead of taking responsibility for his actions and making real efforts to improve.

Plaintiff's response to the reprimand simply confirmed that he was unable to accept responsibility for his shortcomings and was

unwilling to make changes in his attitude toward supervision and his counseling approach. His repeated references to himself as a dedicated counselor and his copying of the letter to Pope John Paul and President Reagan indicated to his superiors that he continued to hold bizarre, grandiose views of himself. Plaintiff was fired because his supervisors considered him an ineffective counselor who posed a potential threat to the well-being of his clients, not because he expressed criticism of Juvenile Court officials. Protected speech was therefore not a motivating factor in plaintiff's termination. *See McAdams v. Matagorda County Appraisal Dist.*, 798 F.2d 842, 846–47 (5th Cir.1986) (no liability where plaintiff was fired not because he voiced criticism of employers or because of his specific criticisms, but because he would not cooperate with defendant employers and spoke to them in hostile and rude manner).[8]

Accordingly, the Court rejects plaintiff's claim that defendants violated his First Amendment rights.[9] An appropriate order accompanies this opinion.

---

8. Given the Court's conclusion that plaintiff has failed to satisfy the first two parts of the *Daniels* test, it is unnecessary for the Court to proceed to the third stage of the analysis.

9. Because the Court finds that plaintiff's constitutional rights were not violated, it need not reach the following issues, raised in the Post-

Trial Brief of Defendants Picciano and Fedeli: (1) whether Picciano and Fedeli were proper defendants and (2) whether the good faith immunity doctrine, *see, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), protects defendants from liability.