Matthew B. GOODALL, an infant by his father and next friend, Robert B. GOODALL; Robert B. Goodall; Kathleen N. Goodall, Plaintiffs–Appellants,

v.

STAFFORD COUNTY SCHOOL BOARD, Defendant–Appellee.

No. 90–1014.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1991.

Decided April 11, 1991.

Robert Brandt Goodall, argued, Easterling & Goodall, Stafford, Va., for plaintiff-sappellants.

Scott Sanford Cairns, McGuire, Woods, Battle & Boothe, Richmond, Va., for defendant-appellee.

Kathleen S. Mehfoud, Hazel & Thomas, P.C., Richmond, Va., on brief, for amicus curiae Virginia School Boards Ass'n.

J.T. Tokarz, Richmond, Va., on brief, for amicus curiae County School Bd. of Henrico County.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and YOUNG, Senior U.S. District Judge for the District of Maryland, sitting by designation.

MURNAGHAN, Circuit Judge:

Matthew B. Goodall, an infant by his father and next friend (and counsel) Robert B. Goodall, Robert B. Goodall and Matthew's mother, Kathleen N. Goodall (collectively the Goodalls), brought an action in the United States District Court for the Eastern District of Virginia, Alexandria Division, seeking an order directing appellee School Board of Stafford County, Virginia to provide Matthew, who is deaf, with a cued speech interpreter at Fredericksburg Christian School. The Goodalls also sought reimbursement for costs incurred in providing such an interpreter themselves. On cross-motions for summary judgment, the district court entered judgment in favor of the County, and the Goodalls have appealed.

Matthew Goodall is a minor and has been a resident of Stafford County since his birth. He became profoundly hearing impaired after an attack of meningitis at age 3½. Shortly thereafter, he was identified as a handicapped child for whom special education services were appropriate.

In 1980, 1981, 1982 and 1983, Individualized Educational Plans (IEPs) were prepared for Matthew, with the consultation and concurrence of Matthew's parents, calling for special education and related services to be provided at Spotswood Elementary School, a public school. Matthew attended a preschool class in the regional special education program at Spotswood Elementary School along with several other deaf children who were about his age. Matthew continued to participate in the program through the first grade.

In 1984, Matthew's parents voluntarily placed Matthew at The Word of Life School, a private religious school in Fredericksburg, Virginia, which he attended through the fourth grade. In 1986, they voluntarily placed Matthew in the Stafford Christian School, a private religious school in Stafford, for the fifth and sixth grades.

In 1988, Matthew's parents decided that he should attend Fredericksburg Christian School, a private religious school, to further his religious education and development. Fredericksburg Christian School is a sectarian, religious school, in which Christian teachings are woven into the curriculum together with non-religious subjects. The curriculum includes Biblical education and spoken prayer as one of the daily activities. Matthew receives no special education at Fredericksburg Christian School.

In the summer of 1988, the Goodalls requested that the public schools of Stafford County again provide special education services to Matthew. An IEP meeting was held in September of 1988. The Goodalls participated in the meeting and a draft IEP was prepared. The draft IEP indicated that hearing-related services were still appropriate for Matthew and proposed to provide those services at the Drew Middle School, a Stafford County public school.

Matthew's parents objected to Matthew's receiving interpretive services at Drew Middle School and asked the County to provide a full-time cued speech interpreter at Fredericksburg Christian School. The Goodalls wanted the County to provide a cued-speech interpreter to be present, full-time, in Matthew's classroom. The interpreter's job would be to interpret the

sounds in the classroom into physical representations that Matthew could understand. Thus, the interpreter they envisaged would need to be present during Matthew's religious instruction and would interpret that religious instruction to enable Matthew to understand.

The County denied the Goodalls' request, but offered to provide a cued speech interpreter to Matthew at Drew Middle School, a public school in Stafford County. Nothing suggests other than that the County stands ready to do so today. The Goodalls requested a due process hearing to challenge the County's position. The state Hearing Officer ruled that the County was not responsible for providing a cued speech interpreter to Matthew because he was unilaterally placed in a private, sectarian school by his parents for personal reasons. The Hearing Officer further held that for the County to provide a cued speech interpreter at Fredericksburg Christian School with public funds would violate the Establishment Clause of the First Amendment to the United States Constitution.

The Goodalls appealed the Hearing Officer's decision to the Virginia Department of Education. The state Review Officer's decision of September 9, 1989 affirmed the decision of the Hearing Officer, specifically holding that the requested action would violate the Establishment Clause.

The Goodalls then filed the action currently before us on October 10, 1989, seeking an order directing the County to provide a cued speech interpreter for Matthew Goodall at Fredericksburg Christian School and seeking reimbursement for their costs incurred in providing such an interpreter to Matthew.

From a summary judgment in the favor of the County School Board the Goodalls have appealed.

We first address the question whether Virginia or the federal special education law requires the County to provide a cued speech interpreter to a student at a private, sectarian school. The Goodalls have contended that the Virginia laws and regulations implementing federal assistance under the Education of All Handicapped Children Act, 20 U.S.C. § 1400 *et seq.* (EHA), require Stafford County to provide Matthew with a cued speech interpreter at the Fredericksburg Christian School.

The EHA is a comprehensive entitlement program providing federal financial assistance to participating states for the education of handicapped children. To qualify for the funds, a participating state must have in effect "a policy that assures all handicapped children the right to free appropriate public education." *Id.* § 1412(1). *See generally Board of Educ. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The Act places primary responsibility for the provision of such appropriate public education on state and local educational agencies. 20 U.S.C. § 1400. Receipt of federal funds is also conditioned upon submission of a satisfactory special education plan. *Id.* § 1412(2).

The Commonwealth of Virginia is a participating state and has established the required policy in the Virginia Code, §§ 22.1–213 to –221; the Virginia Constitution, art. VIII, § 10; and the state's special education regulations. *See Schimmel By Schimmel v. Spillane,* 819 F.2d 477, 484 (4th Cir.1987). Virginia's policies and procedures have been approved by the United States Department of Education.[1]

Several provisions of the Virginia Code implementing the EHA specifically draw a distinction between nonsectarian schools and sectarian schools such as Fredericksburg Christian School. *See* Va.Code Ann., §§ 22.1–216, 218, and 220. The Goodalls seek to advance the argument that the combined effect of the three statutes, limited as they are to non-sectarian private schools, does not prohibit the County from furnishing Matthew with a cued speech interpreter at a sectarian school because, while a religious school contract is not referred to in section 22.1–216, the County could provide the service with its own employees or with interpreters hired through

1. Fredericksburg Christian School is not on the list of private schools approved by the Virginia Department of Education to provide special education and related services under the EHA.

non-sectarian schools or agencies.[2] With the hope of buttressing their position, the Goodalls point to section 22.1–219 of the Virginia Code:

> Nothing in this article shall be construed to restrict or prohibit the use of any federal, state or local funds made available under any federal, state or local appropriation or grant.

Ingenious the Goodalls' arguments may be, but they fail to hold water when viewed from the greater context of the general prohibitions regarding sectarian schools found in the Virginia Constitution and other sections of the Virginia Code. As one example, in legislating for children in the custody of state boards or agencies, the General Assembly has authorized education in any public or "private nonsectarian school" but not in sectarian ones. Va. Code Ann. § 22.1–7. In addition, Article VIII, § 10 of the Virginia Constitution prohibits appropriations to sectarian schools or institutions of learning.

Virginia's constitutional terms and statutory language consistently express a policy of funding special education only in nonsectarian schools. Section 22.1–219 was simply designed to ensure that handicapped students are not denied the benefit of *other* federal, state or local programs simply because Virginia has mandated the delivery of a free and appropriate education for them. The interpretation sought by the Goodalls would eliminate in large measure the "nonsectarian" qualification in Virginia Code sections 22.1–216, 218, and 220, as well as the Virginia Constitution. *See Posey v. Commonwealth,* 123 Va. 551, 553, 96 S.E. 771 (1918) (ruling that a statute should be interpreted in a way that gives effect to all of its provisions).[3]

Moving agilely to another legal area, the Goodalls next contend that, even if Virginia law can be construed as prohibiting the County's provision of a cued speech interpreter at Fredericksburg Christian School, federal law—the EHA—mandates such a requirement, and thus by nature of the Supremacy Clause, displaces Virginia law.

The attempt to place state and federal law at odds with one another is grounded on an assertion made by the County before the district court a) that the EHA expressly incorporates state educational standards, and b) that, when a handicapped child is educated at a private school under the EHA, the state has an obligation to ensure that the school meets those educational standards. *See Schimmel By Schimmel,* 819 F.2d at 484; 20 U.S.C. § 1413(a)(4)(B).

The Goodalls have noted that the EHA, the federal regulations promulgated thereunder, and the Virginia Special Education Regulations all draw distinctions between handicapped students enrolled in private schools *by the state* and handicapped students enrolled in private schools *by their parents.* The federal statute, 20 U.S.C. § 1413(a)(4)(B), which places an obligation upon the state to ensure that private schools meet state educational standards explicitly applies only to students placed in private schools *by the state.* Thus, the Goodalls urge, in a logical leap of rather Gargantuan size, that the EHA prohibits the state from imposing its educational standards—specifically, the sectarian, nonsectarian distinction—on private schools at which handicapped students are voluntarily enrolled by their parents.

If anything, however, section 1413(a)(4)(B) imposes an additional burden on the state when expending federal funds by enrolling handicapped students at pri-

---

**2.** Other arguments to like effect are advanced that 1) the Goodalls, not the County School Board, would place Matthew at Fredericksburg Christian School, and 2) limitations as to what, under the law of the Commonwealth, the County School Board could do would not extend to county expenditure of federal EHA funds.

**3.** The Goodalls' reliance upon Va. Special Educ. Reg. 3.4(B)(7) is similarly unavailing. That regulation merely stands for the proposition that if

a parochial school student takes advantage of special education and related services offered by the local educational authority, representatives of the parochial school must be afforded the opportunity to participate in the development of the student's IEP. Nothing in the language of the regulation suggests a requirement for the County to provide special education and related services to parochial students *on site.*

vate schools. In such a case, for example, the EHA would prohibit a state from placing a handicapped student in a non-accredited private school. With regard to expenditures of federal funds for handicapped students voluntarily enrolled at private schools, the state is simply relieved of its state standard burden, if it so chooses, but is free, on the other hand, to take on that burden if it wishes.

The distinction does take on additional significance, however, with regard to the type of assistance the EHA requires to be provided. And as the district court has correctly asserted, the key issue in the instant case is the meaning of the regulatory requirement that school divisions "provide" special education and related services to private school handicapped children.

34 C.F.R. § 300.403(a) provides that [i]f a handicapped child has available a free appropriate public education and the parents choose to place the child in the private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility. However, the public agency shall make services *available* to the child as provided under §§ 300.450–300.460.

(Emphasis added.) 34 C.F.R. § 300.452 provides:

Each local educational agency shall *provide* special education and related services designed to meet the needs of private school handicapped children residing in the jurisdiction of the agency.

(Emphasis added.) And 34 C.F.R. § 76.654(a), part of the Educational Department General Administrative Regulations (EDGAR), obliges local school divisions to provide "program benefits" that are "comparable in quality, scope, and opportunity for participation" to the program benefits that the subgrantee provides for students enrolled in public schools.

Despite the fact that the County stands ready to provide Matthew with a cued speech interpreter at Drew Middle School,

the Goodalls insist that the federal regulations quoted above require the provision of such services on the premises of sectarian institutions.[4] A wealth of authority from federal district courts, the Department of Education, and other sections of the Code of Federal Regulations, however, overwhelmingly refutes the argument.

In *McNair v. Cardimone,* 676 F.Supp. 1361 (S.D.Ohio 1987), the district court held:

Where a free appropriate public education is available, and the parents choose to place their child in a private school, the school district is not required to pay for the child's education, but is only required to (1) have free appropriate public education available to the child should she return to public school, and (2) provide a *genuine opportunity* for equitable participation by the child in programs funded under part B of the Act within the jurisdiction served by the local school district.

. . . .

We find that § 300.452 can only be interpreted to mean that a local school district need not pay for a child's related services when the child's parents choose to place her in a private school.

*Id.* at 1372 (emphasis added). *See also Work v. McKenzie,* 661 F.Supp. 225, 229 (D.D.C.1987) (when public agency provides free appropriate public education, and parents choose to place child in private school nevertheless, public agency is not required to pay for child's education at private school).

In *Barnett v. Fairfax County School Board,* 927 F.2d 146 (4th Cir.1991), we held that the local school system was not required to duplicate a cued speech program for the plaintiff alone merely because there existed a high school which was slightly closer to his house or which he would rather attend. In so ruling we noted that "[a]dopting plaintiff's position would re-

---

**4.** Apparently the argument must become that Matthew does not have "available a free appropriate public education" because education is not appropriate unless it is provided at Freder-

icksburg Christian School. While we admire the Goodalls' tenacious attempts, any such contention, if successful, would play ducks and drakes with the statute and regulations.

quire us to intrude upon the educational policy choices that Congress deliberately left to state and local school officials. Whether a particular service or method can feasibly be provided in a specific special education setting is an administrative determination that state and local school officials are far better qualified and situated than are we to make." *Id.* at 152–153.

The emphasis on provision of an *opportunity* is clearly stated in 34 C.F.R. § 76.651(a)(1):

A subgrantee shall provide students enrolled in private schools with a genuine opportunity for equitable participation in accordance with the requirements in §§ 76.652–76.662 and in the authorizing statute and implementing regulations for a program.

If the Goodalls are held to be correct in their reading of federal law, the U.S. Department of Education would not properly have been able to accept the prohibitions on services to sectarian schools contained in Virginia's constitution and statutes. Nor would it have approved the Virginia regulation listing acceptable alternatives for school division compliance with 34 C.F.R. § 300.403, which provides:

Services to private school handicapped children may be provided through dual enrollment, educational radio and television, and the use of mobile educational services and equipment.

Va.Spec.Educ.Reg. III(3.4)(B)(9)(c) at 73.

Most telling is the Department of Education's response to an inquiry submitted by Robert Goodall to Dr. Judy Schrag, Director of the Office of Special Education Programs, reported at *Goodall*, 16 EHLR 1398 (1990). In the inquiry, Goodall asked the Department to invoke a "by-pass" provision set out in section 1413(d) of the EHA, whereby the Secretary of Education is authorized to implement a bypass if a state educational agency is prohibited by law from providing for the participation of private school handicapped children in the program assisted or carried out under the Act. The law Goodall claimed as the basis of his by-pass request was Va.Code Ann. § 22.1–216, *supra.*

In denying Goodall's request, the Department stated:

The statutory provision [section 22.1–216], on its face, only precludes a local educational agency (LEA) in Virginia from contracting with private sectarian schools for the purpose of providing special education to children with handicaps enrolled in those schools. There is nothing in the law which would prevent an LEA from using its own personnel and facilities to provide special education to those students, as long as it did not contract with a private sectarian school. At most, this law precludes LEAs from serving children with handicaps on the site of private sectarian schools. A limitation on the location at which some children with handicaps enrolled in private schools can be served, however, does not constitute a prohibition against the participation of these children in the special education program carried out pursuant to the EHA–B by Virginia and its LEAs....

SEAs [State educational agencies] and LEAs do not necessarily have to provide services on the premises of private schools in order to meet their obligations under 20 U.S.C. § 1413(a)(4)(A). Rather, department regulations provide that students with handicaps enrolled in private schools must be provided by SEAs and LEAs "with a genuine opportunity for equitable participation" in the special education carried out by these agencies. The Department has long held that it is possible for SEAs and LEAs to provide students with handicaps enrolled in private schools with a genuine opportunity for equitable participation by serving them at a public school or neutral site. Whether an LEA would have to provide on-site services to meet the "equitable participation" requirement would depend on the specific facts respecting each of the students with handicaps enrolled in private schools within its jurisdiction to whom it is providing services.

*Id.* at 1399–1400 (citation and footnote omitted).

In short, by offering Matthew the services of a cued speech interpreter at Drew Middle School, the County is in full compliance with the requirements of the EHA and the regulations promulgated thereunder. If the County's offer of services in a public school is "meaningless" to Matthew, as his parents claim, it is because of the parents' decisions and conditions for Matthew's education, not by the operation of any state or federal law.

Finally, lest there be any remaining question as to a conflict between the EHA and the prohibitions against funding to sectarian schools imposed by Virginia, 34 C.F.R. § 76.532 of EDGAR provides, in pertinent part,

(a) No State or subgrantee may use its grant or subgrant to pay for any of the following:

(1) Religious worship, instruction, or proselytization.

(2) Equipment or supplies to be used for any of the activities specified in paragraph (a)(1) of this section.

The County's provision of a cued speech interpreter to Fredericksburg Christian School would fall squarely within the regulation's prohibition.

■ Failing to persuade us at the statutory level that cued speech must be provided to Matthew at Fredericksburg Christian School, the Goodalls have turned to the Free Exercise and Establishment Clauses of the First Amendment of the United States Constitution. They have insisted that the district court's reaching a decision on non-constitutional grounds could not stop there but must proceed to discuss constitutional problems. We agree.

This is not a case where resolution of the constitutionality of a statute may be avoided where a construction of the statute is fairly possible. *See Communist Party of the United States v. Subversive Activities Control Bd.*, 351 U.S. 115, 122, 76 S.Ct. 663, 666, 100 L.Ed. 1003 (1956) ("case must be decided on a non-constitutional issue, if the record calls for it, without reaching constitutional problems"); 16 Am.Jur.2d *Constitutional Law* §§ 160, 172 (1979). It is not the state or federal education statutes the Goodalls challenge constitutionally, but rather, the actions of the County. We must thus go on to consider whether the County's actions pass constitutional muster. *See Johnson v. Mayor and City of Baltimore*, 731 F.2d 209, 210–11 (4th Cir.1984) (Baltimore City's pension plan examined under Equal Protection Clause of Fourteenth Amendment and under Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*).

The Goodalls have alleged that the County's denial of publicly funded cued speech interpretation at Fredericksburg Christian School burdens their religious belief that "they are to provide their children with Christian education and to educate their children in Christian schools." In so asserting, they rely on a line of Supreme Court cases holding that the denial of unemployment compensation benefits for persons whose religious beliefs prevented them from working on certain days of the week or in certain occupations violated the Free Exercise Clause of the First Amendment. *Frazee v. Illinois Dep't of Employment Security*, 489 U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989); *Hobbie v. Unemployment Appeals Comm.*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The Court held, for example, in *Thomas* that,

[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

450 U.S. at 717–18, 101 S.Ct. at 1431–32. Those cases held that such infringements must be subjected to strict scrutiny and can be justified only by a compelling state interest. Because we find a compelling

state interest to exist, we find that the Free Exercise clause has not been violated.

It is the well-settled law of the Fourth Circuit that the avoidance of a violation of the Establishment Clause of the First Amendment constitutes such a compelling state interest. *See Smith v. County of Albemarle*, 895 F.2d 953, 959–60 (4th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990); *Langlotz v. Picciano*, 683 F.Supp. 1041, 1048 (E.D.Va.1988), *aff'd*, 905 F.2d 1530 (4th Cir.1990) ("Plaintiff's free exercise rights …, if any, are clearly outweighed by the [state's] compelling interests in avoiding Establishment Clause violations").[5] Accordingly, the County's decision not to provide Matthew with a cued speech interpreter in connection with his attendance at a sectarian school and the prohibitions against its so providing contained in Virginia and federal law, do not violate the Free Exercise Clause contained in the First Amendment of the Federal Constitution. It would be out of the frying pan into the fire for the County to accede to the Goodalls' demands.

■ The seminal Establishment Clause case is *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), in which the Supreme Court has set forth a three-part test to determine whether government action impermissibly establishes, sponsors, or results in active involvement in religious activity. Such action violates the constitution if any one of the following prongs is not satisfied:

1. the government action must have a secular purpose;
2. the action must not have the primary effect of advancing religion; and
3. the action must not create excessive entanglement between church and state.

*Id.* at 612–13, 91 S.Ct. at 2111–12.

One proposition advanced by the County was that a cued speech interpreter at Fredericksburg Christian School would participate in the inculcation of religious tenets and beliefs, because the interpreter would communicate to Matthew all the religious messages propounded by Matthew's teachers. The Goodalls have attempted to counter that, even if the EHA were held to permit the provision of an interpreter at a sectarian school, the statute as a whole would still not have the primary effect of advancing religion.

The Supreme Court has denied various types of aid and services to Christian schools while permitting others, and a discussion of the distinctions between the two is instructive. In *Lemon v. Kurtzman*, the Court struck down statutes in Pennsylvania and Rhode Island which would have permitted the states to pay teacher salary supplements as well as provide reimbursement for textbooks and instructional materials. The reimbursement provisions were struck down despite guarantees that the teachers would segregate their religious beliefs from their teaching responsibilities, because "the potential for impermissible fostering of religion [was] present." 403 U.S. at 619, 91 S.Ct. at 2114.

In *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the Court noted that even providing instructional material and equipment to "religion pervasive institutions" would impermissibly foster religion even though those items were "ostensibly limited to wholly neutral, secular instructional material and equipment." *Id.* at 366, 95 S.Ct. at 1763.

Finally, in *Grand Rapids School District v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), the Court, in striking down a scheme to provide public school programs on non-public school sites, discussed how publicly funded programs related to education might impermissibly advance religion:

First, the [personnel] participating in the programs may become involved in intentionally or inadvertently inculcating particular religious tenets or beliefs. Second, the programs may provide a crucial, symbolic link between government and religion, thereby enlisting—at least in the eyes of impressionable youngsters— the powers of government to the support

---

5. The County's refusal to provide an interpreter is also justified by a compelling interest in not

violating the establishment clause of Va. Const. art. I, § 16.

of the religious denomination operating in the school. Third, the programs may have the effect of directly promoting religion by impermissibly providing a subsidy to the primary religious mission of the institutions affected. *Id.* at 385, 105 S.Ct. at 3223. The *Grand Rapids* Court went on to note that "[a]lthough Establishment Clause jurisprudence is characterized by few absolutes, the Clause does absolutely prohibit government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith." *Id.*

Viewed in the light of those cases, especially the holding in *Meek v. Pittenger*, the providing of a cued speech interpreter in attendance at all-day sessions at a sectarian school would undoubtedly infringe the Establishment Clause. At least one district court has reached the same conclusion. In *Zobrest v. Catalina Foothills*, 1988–89 EHLR 441:564 (D.Ariz., July 19, 1989), the court ruled that

> the provision of a publicly-paid sign language interpreter at Salpointe, a pervasively sectarian school, would violate the separation of church and state.

. . . .

> The interpreter would act as a conduit for the religious inculcation of James—thereby promoting James's religious development at government expense. That kind of entanglement of church and state is not allowed.

*Id.* (*citing Grand Rapids* and *Meek v. Pittenger*).

The cases of indirect aid which the Supreme Court has sanctioned and upon which the Goodalls rely are readily distinguishable from the instant facts.

The Goodalls rely primarily upon *Witters v. Washington Dep't of Services for the Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). Witters was a student attending a Christian college in the State of Washington who suffered from a progressive visual condition which made him eligible for state vocational rehabilitation assistance to blind persons. Witters applied to a state agency for rehabilitation assistance consisting of payments for education. The Court held that the extension of aid under the Washington program to finance his training at the Christian college would not advance religion in a manner inconsistent with the Establishment Clause.

*Witters* is the last of a line of cases in which the Supreme Court has upheld tax deductions taken by and tuition reimbursements to students at religious institutions. *See Committee for Public Education & Religious Liberty v. Regan*, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Sloan v. Lemon*, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973). As such, the decision has little application to the instant case. In each of those cases, the Court was confident that there existed an "effective means for insuring that the cash reimbursements would cover only secular services." *Regan*, 444 U.S. at 659, 100 S.Ct. at 849. *Witters* and its predecessors provide little or no support for the provision of state-funded personnel working at sectarian institutions who would be directly involved in the inculcation of religious beliefs of the handicapped students they served.

*Board of Educ. v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), and *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), also cited by the Goodalls, provide them with little support as well. In *Board of Educ. v. Allen*, the Court upheld a law which required public school authorities to lend textbooks free of charge to students in private schools even if the schools were religious. 392 U.S. at 248, 88 S.Ct. at 1929. And in *Wolman v. Walter*, the Court approved the provision of state-prepared standardized tests and some health diagnostic services to sectarian school students. 433 U.S. at 244, 97 S.Ct. at 2603. Essential to both holdings was the easily ascertainable, *purely secular* content of the goods and services provided. In Matthew's case, the religious content of the cued speech aid provided at Fredericksburg Christian School would be pervasive. The County, in

**372**

the proceedings below, made the point (without the Goodalls apparently disagreeing) that religion permeated every aspect of the daily curriculum at the Fredericksburg Christian School, and that Matthew's cued speech interpreter would be interpreting for him at all times.

We consequently have come to the conclusion that the relief sought is not afforded on statutory grounds and that no First Amendment violations ensue.

The judgment is AFFIRMED.