**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 4 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAY FOWLER and BARBARA FOWLER, parents
and next friend of MICHAEL FOWLER,

      Plaintiffs - Appellees,

    v.

UNIFIED SCHOOL DISTRICT NO. 259,
SEDGWICK COUNTY, KANSAS,

      Defendant - Appellant.

------------------------------------------------------

UNITED STATES OF AMERICA; NATIONAL
SCHOOL BOARDS ASSOCIATION; KANSAS
ADVOCACY & PROTECTIVE SERVICES, INC.;
MOST REVEREND JAMES P. KELEHER,
ARCHDIOCESE OF KANSAS CITY, KANSAS;
MOST REVEREND STANLEY G. SCHLARMAN,
DIOCESE OF DODGE CITY, KANSAS; MOST
REVEREND GEORGE K. FITZSIMONS,
DIOCESE OF SALINA, KANSAS; MOST
REVEREND EUGENE J. GERBER, DIOCESE OF
WICHITA, KANSAS; NATIONAL
ASSOCIATION OF THE DEAF; NATIONAL
CUED SPEECH ASSOCIATION; THE
AMERICAN SOCIETY FOR DEAF CHILDREN;
and KANSAS ASSOCIATION OF THE DEAF,

      Amici Curiae.

---

Nos. 95-3373
and 95-3400

Roger M. Theis and Thomas R. Powell of Hinkle, Eberhart & Elkouri, L.L.C., Wichita, Kansas, on the briefs for Defendant-Appellant.

Mary Kathleen Babcock, Timothy B. Mustaine, and Martha Aaron Ross of Foulston & Siefkin, L.L.P., Wichita, Kansas, on the briefs for Plaintiffs-Appellees.

William Kanter and Frank A. Rosenfeld, Civil Division, Department of Justice, Washington, D.C., on the briefs for amicus curiae, the United States of America.

Gwendolyn H. Gregory, Deputy General Counsel, August W. Steinhilber, General Counsel, and Thomas A. Shannon, Executive Director, National School Boards Association, Alexandria, Virginia, on the briefs for amicus curiae, the National School Boards Association.

Sherry C. Diel, Kansas Advocacy & Protective Services, Inc., Topeka, Kansas, on the briefs for amicus curiae, the Kansas Advocacy & Protective Services, Inc.

J. Francis Hesse, Redmond & Nazar, L.L.P., Wichita, Kansas, on the briefs for amicus curiae, Most Reverend James P. Keleher, Archdiocese of Kansas City, Kansas; Most Reverend Stanley G. Schlarman, Diocese of Dodge City, Kansas; Most Reverend George K. Fitzsimons, Diocese of Salina, Kansas; Most Reverend Eugene J. Gerber, Diocese of Wichita, Kansas.

Douglas R. Cyrex, Gonzales, Louisiana, Marc P. Charmatz and Sarah S. Greer, National Association of the Deaf Law Center, Silver Spring, Maryland, on the briefs for amicus curiae, the National Association of the Deaf, National Cued Speech Association, The American Society for Deaf Children, and Kansas Association of the Deaf.

Before **ANDERSON**, **LUCERO**, and **MURPHY**, Circuit Judges.

**ANDERSON**, Circuit Judge.

In February, 1997, we held that the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1420 ("IDEA"), and the regulations thereunder, as well as Kansas law, required the defendant, Unified School District No. 259, to at least partially pay for an on-site sign language interpreter for the plaintiff, Michael Fowler, a deaf child voluntarily attending a private school. Fowler v. Unified Sch. Dist. No. 259, 107 F.3d 797 (10th Cir. 1997), cert. granted and vacated, 117 S. Ct. 2503 (1997). Both sides filed petitions for certiorari, which the Supreme Court granted in order to vacate our decision and remand the case to us "for further consideration in light of the Individuals With Disabilities Education Act Amendments of 1997." Unified Sch. Dist. No. 259 v. Fowler, 117 S. Ct. 2503 (1997); Fowler v. Unified Sch. Dist. No. 259, 117 S. Ct. 2503 (1997) (same).[1] We directed the parties to submit simultaneous briefs on the effect of those Amendments on this case, including the impact, if any, of the effective date of those Amendments and whether this case should be remanded to the district court for further factual findings. We have considered the parties' briefs, as well as the amicus brief filed by the United States, and we again reverse the district court's decision and remand for further proceedings.

---

[1]Our decision was vacated along with all other cases with petitions for certiorari pending before the Supreme Court which involved the same or similar issues as the ones presented in this case.

## BACKGROUND

We need not set out in detail the facts or procedural history of this case, as they were stated in our prior panel decision. We only present essential facts as necessary for us to address the effect of the IDEA Amendments on this case.

Michael Fowler is a profoundly deaf twelve-year-old boy who, because he requires specially designed instruction for this condition, qualifies as a child with disabilities under Part B of the IDEA. He is also gifted, having been found by the school district to be "of very superior intellectual capacity." Fowler v. Unified Sch. Dist. No. 259, 900 F. Supp. 1540, 1541 (D. Kan. 1995), rev'd, 107 F.3d 797 (10th Cir.), cert. granted and vacated, 117 S. Ct. 2503 (1997). After he spent four years at the public school where the District elected to cluster hearing-impaired students, Michael's parents voluntarily placed him in a private nonsectarian school where they felt his intellectual needs would be better met. They requested that the District provide interpretive services to Michael on site. The District denied the request. That denial was upheld through administrative proceedings.

When the Fowlers appealed the denial to the district court, the district court held that the District must pay the entire cost of such services. On appeal from that decision, we held that the District must pay "an amount up to, but not more than, the average cost to the District to provide that same service to hearing-impaired students in the public school setting." Fowler, 107 F.3d at 807-08. We derived that obligation from both the

- 4 -

IDEA and its regulations and from Kansas statutory law. Because the 1997 IDEA Amendments address the scope of services to students voluntarily placed in private schools, the Supreme Court vacated our decision and remanded it to us to consider the effect of those Amendments.

## I. **IDEA**:

The IDEA provides federal grants to states, which states then use as part of the funds they give to local educational agencies to assist such agencies in educating students with disabilities. States electing to participate in this system of grants must establish and have "in effect a policy that assures all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1). Among the many areas of contention since the IDEA's passage has been the extent to which children whose parents have voluntarily placed them in private schools may participate in special education programs and services provided pursuant to the Act, and, more specifically, what obligation, if any, a school district has to pay for such services.

Prior to its recent amendment, the IDEA provided that, with respect to students, like Michael, voluntarily attending private schools, each state must:

> set forth policies and procedures to assure–that, to the extent consistent with the number and location of children with disabilities in the State who are enrolled in private elementary and secondary schools, provision is made for the participation of such children in the program assisted or carried out under this subchapter by providing for such children special education and related services.

§ 1413(a)(4)(A). While the IDEA regulations did make clear that if a "free appropriate education" ("FAPE") was available to a student, and the parents voluntarily placed the student in a private school, the local educational agency was not obligated to pay for the full cost of the student's education, 34 C.F.R. § 300.403(a), what was unclear under the Act and its regulations was the extent of the agency's obligation to make special education services available to such a student. Compare Cefalu v. East Baton Rouge Parish Sch. Bd., 103 F.3d 393, withdrawn and superseded on rehearing, 117 F.3d 231 (5th Cir. 1997) and Russman v. Sobol, 85 F.3d 1050 (2d Cir. 1996), cert. granted and vacated, 117 S. Ct. 2502 (1997) with K.R. v. Anderson Community Sch. Corp., 81 F.3d 673 (7th Cir. 1996), cert. granted and vacated, 117 S. Ct. 2502 (1997) and Goodall v. Stafford County Sch. Bd., 930 F.2d 363 (4th Cir. 1991).

The IDEA was recently amended by Congress, so that now the Act provides as follows for children enrolled by their parents in private schools:

> (A) CHILDREN ENROLLED IN PRIVATE SCHOOLS BY THEIR PARENTS.–
>
> (i) IN GENERAL.–To the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary and secondary schools, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the following requirements, unless the Secretary has arranged for services to those children under subsection (f):

(I) <u>Amounts expended for the provision of those services</u> by a local educational agency <u>shall be equal to a proportionate amount of Federal funds</u> made available under this part.

(II) Such services may be provided to children with disabilities on the premises of private, including parochial, schools, to the extent consistent with law.

(ii) CHILD-FIND REQUIREMENT.–The requirements of paragraph (3) of this subsection (relating to child find) shall apply with respect to children with disabilities in the State who are enrolled in private, including parochial, elementary and secondary schools.

. . . .

(C) PAYMENT FOR EDUCATION OF CHILDREN ENROLLED IN PRIVATE SCHOOLS WITHOUT CONSENT OF OR REFERRAL BY THE PUBLIC AGENCY.–

(i) IN GENERAL.– <u>Subject to subparagraph (A)</u>, this part does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

Individuals with Disabilities Education Act Amendments of 1997, Pub. L. No. 105-17, tit.1, § 612(a)(10)(A), (C), 111 Stat. 37, 62-63 (1997) (emphasis added) [hereinafter Amendments].  There are no final regulations yet implementing the Amendments, although the Department of Education has recently issued proposed regulations, which

are now subject to public comment.  See Assistance to States for the Education of Children with Disabilities, 62 Fed. Reg. 55026 (1997) (proposed Oct. 22, 1997).

The Amendments specified they would "take effect upon the enactment of this Act," which was June 4, 1997.  Amendments, tit.II, § 201(a)(1).  The Amendments nowhere state that they apply retroactively, and courts addressing the effect of the Amendments have held they are prospective only.  See Heather S. v. Wisconsin, No. 96-3340, 1997 WL 572409, at *19 (7th Cir. Sept. 16, 1997); K.R. v. Anderson Community Sch. Corp., No. 95-2497, 1997 WL 586432, at *2 n.* (7th Cir. Sept. 10, 1997); Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 247 n.1 (5th Cir. 1997).  This is completely consistent with the Supreme Court's repeated invocation of the "'presumption against retroactive legislation [that] is deeply rooted in our jurisprudence.'"  Hughes Aircraft Co. v. United States, 117 S. Ct. 1871, 1876 (1997) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994)).

The District argues, however, that the legislative history of the IDEA Amendments shows that § 612(a) merely "clarified" the IDEA and did not change existing federal law.  Thus, it argues that there is no issue of retroactivity in this case, because the Amendments simply explain the proper interpretation of the prior version of the statute, and, accordingly, argues that our panel decision was incorrect under both the pre-Amendments and post-Amendments IDEA.

The legislative history upon which the District relies is the following:

Section 612 [20 U.S.C. § 1412] contains <u>clarifications of current law</u>. . . .

. . . .

The bill makes a <u>number of changes to clarify</u> the responsibility of public school districts to children with disabilities who are placed by their parents in private schools. These <u>changes should resolve a number of issues that have been the subject of an increasing amount of litigation in the last few years</u>. First, the bill specifies that the total amount of money that must be spent to provide special education and related services to children in the State with disabilities who have been placed by their parents in private schools is limited to a proportional amount (that is, the amount consistent with the number and location of private school children with disabilities in the State) of the Federal funds available under part B.

H.R. Rep. No. 105-95, at 90, 92-93 (1997), <u>reprinted in</u> 1997 U.S.C.C.A.N. 78, 88, 90

(July 1997 Supp.) (emphasis added). The Senate Report contains identical language. <u>See</u>

S. Rep. No. 105-17 (1997), 1997 WL 244967 (Leg. Hist.).[2]

---

[2]There was little discussion in the floor debates about the particular Amendments at issue in this case. What there was is inconclusive on whether legislators viewed the Amendments as implementing substantive changes. Representative Castle, in endorsing the bill, stated that "[i]t contains a number of important <u>reforms</u> that address some of [the] current law's unintended and costly consequences. . . . <u>This bill makes it harder</u> for parents to unilaterally place a child in elite private schools at public taxpayer expense, lowering costs to local school districts." 143 Cong. Rec. H2498-04 at H2536 (daily ed. May 13, 1997) (emphasis added). The reference to "reforms" and making it "harder" to place children in private schools suggests that Rep. Castle viewed the Amendments as changing the current law.

Senator Harkin, also in support of the bill, stated "the bill <u>clarifies</u> that public agencies are required to spend a proportionate amount of IDEA funds on special education and related services for disabled children enrolled in private [schools]." 143 Cong. Rec. S4295-03 at S4300 (daily ed., May 12, 1997) (emphasis added). He then stated that "the bill <u>reiterates current policy</u> [referring apparently to the policy of the

(continued...)

We have observed that Congress may have various motivations when it amends a statute. "'Congress may amend a statute simply to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases.'" O'Gilvie v. United States, 66 F.3d 1550, 1559 (10th Cir. 1995) (quoting Wesson v. United States, 48 F.3d 894, 901 (5th Cir. 1995)), aff'd, 117 S. Ct. 452 (1996). It is hazardous, however, to assume from the enactment of a "clarifying" amendment that Congress necessarily was merely restating the intent of the original enacting Congress. "[T]he view of a later Congress cannot control the interpretation of an earlier enacted statute." O'Gilvie v. United States, 117 S. Ct. 452, 458 (1996); see also Wesson, 48 F.3d at 901 ("'[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'") (quoting United States v. Price, 361 U.S. 304, 313 (1960)); Hawkins v. United States, 30 F.3d 1077, 1082 n.6 (9th Cir. 1994) (noting that statutory amendments do not necessarily

_____

[2](...continued)
Department of Education as expressed through its Office of Special Education Programs] that a public agency is not required to pay for special education and related services at a private school if that agency made a free appropriate public education available to the child." Id. (emphasis added). Senator Harkin used the phrase "reiterates current policy" when discussing the amendment which does, indeed, statutorily codify what the Office of Special Education Programs thought the IDEA regulations already provided. By contrast, he used the term "clarifies" when discussing the amendment which removes ambiguity from a very ambiguous, and unclear, part of the statute and regulations. This may suggest that he knew the difference between reiteration of current law and amendment added in order to remove ambiguity.

In any event, "'[i]nferences from legislative history cannot rest on so slender a reed.'" Cipollone v. Liggett Group, Inc., 505 U.S. 504, 520 (1992) (quoting United States v. Price, 361 U.S. 304, 313 (1960)).

"indicate that Congress gleaned the true intent of previous Congresses"). Additionally, we have observed that "using [an] amendment to interpret Congress' intent [years ago] is a questionable practice, particularly because of the long lapse of time and because the legislative history of both the original statute and the amendment are not enlightening." O'Gilvie, 66 F.3d at 1559. In this case, the length of time is not as long–22 years here compared to 35 or more years in O'Gilvie–but it is long enough to make us reluctant to presume that Congress in 1997 was authoritatively interpreting and clarifying what Congress in 1975 intended.

In any event, the touchstone is Congressional intent–absent a clear indication that Congress intended the Amendments merely to clarify the proper interpretation of its prior Act, we consider the Amendments to implement a change in the Act, and we apply them only to events occurring after the Act's effective date. As the Supreme Court has observed:

> Congress, of course, has the power to amend a statute that it believes we have misconstrued. It may even, within broad constitutional bounds, make such a change retroactive and thereby undo what it perceives to be the undesirable past consequences of a misinterpretation of its work product. No such change, however, has the force of law unless it is implemented through legislation. Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the "corrective" amendment must clearly appear.

Rivers v. Roadway Express, Inc., 511 U.S. 298, 313 (1994).

We therefore hold that our prior interpretation of the pre-Amendments IDEA, based as it was upon a careful analysis of the Act and its implementing regulations, applies to the parties in this case with respect to conduct occurring prior to June 4, 1997. See Amos v. Maryland Dept. of Public Safety & Correctional Servs., No. 96-7091, 1997 WL 581652, at *17 n.8 (4th Cir. Sept. 22, 1997) (noting that "Congress' subsequent amendment [of the IDEA] . . . in no way undermines the reasoning of [a prior case]" interpreting an ambiguous provision of the IDEA). Thus, up to June 4, 1997, the District is obligated to pay for interpretive services for Michael at his private school an amount up to, but not more than, the average cost to the District to provide that same service to hearing-impaired students in the public school setting.

From June 4 onward, the Amendments apply, which we now endeavor to interpret. Substantively, these Amendments appear to provide as follows: if the local educational agency offers FAPE to a child whose parents subsequently voluntarily place him or her in a private school, the agency is not <u>required</u> to pay for the cost of the child's education, including any special education and related services.[3] For such students, the local

_____

[3]The previous regulations stated that for a child offered FAPE, the local educational agency was not required to "pay for the child's education" at a private school the child voluntarily attended. 34 C.F.R. § 300.403(a). The agency was required, however, to "make [special education] services available." <u>Id.</u> Now, the Amendments state that a child offered FAPE is not entitled to the "cost of education, <u>including</u> special education and related services." Amendments, tit. I, § 612(a)(10)(C)(i) (emphasis added). Because this latter section is explicitly made "[s]ubject to subparagraph (A)," which obligates local educational agencies to spend a "proportionate amount of Federal funds"

(continued...)

educational agency's sole obligation is to spend on such students for their "participation" in "special education and related services," "a proportionate amount of Federal funds," which amount is apparently to be derived from considering the "number and location" of such students compared to the total population of students requiring special education and related services. Amendments, tit. I, § 612(a)(10)(A).[4] Thus, the state need not spend any of its own funds to pay for such services; it need only allocate a portion of its Federal funds.

The Act does not make clear, however, whether an equal share of the Federal funds must be allocated for <u>each</u> disabled child enrolled in a private school, or whether the proportionate amount must be allocated for disabled private school students <u>collectively</u>. In the latter case, any particular disabled private school student might receive an amount different from his or her individual proportionate share, and, conceivably, could receive nothing. Moreover, it is not clear whether the local

---

[3](...continued)
on voluntarily placed private school students, we assume that § 612(a)(10)(C) of the Amendments is properly interpreted as providing that students offered FAPE are not entitled to the <u>full</u> cost of their education, but that, as we explain <u>infra</u>, they do share in a "proportionate amount" of Federal funds for special education services.

[4]The proposed regulations define "proportionate amount" as "an amount that is the same proportion of the [local educational agency's] total subgrant [under Part B] . . . as the number of private school children with disabilities . . . residing in its jurisdiction is to the total number of children with disabilities in its jurisdiction." § 300.453, 62 Fed. Reg. 55026, 55094 (1997). The proposed regulations also contain a note indicating that state and local educational agencies "are not prohibited from providing services to private school children with disabilities in excess of those required by this part, consistent with State law or local policy." <u>Id.</u>

educational agency must spend a proportionate share of Federal funds on <u>all</u> special

education and related services needed by private school disabled students, or whether it

has discretion to determine <u>which services</u> it will provide to which students.[5]   While we

---

[5]While we do not have final regulations yet to assist us in interpreting and applying the Amendments, the Department of Education's proposed regulations provide that local educational agencies have discretion to determine how each disabled private school student shall share in the proportionate share of Federal funds to which all such students are collectively entitled.  Specifically, the proposed regulations provide that, after consultation with representatives of private school children, the local agency decides "(1) [w]hich children will receive services . . . ; (2) [w]hat services will be provided; (3) [h]ow the services will be provided; and (4) [h]ow the services provided will be evaluated." § 300.454(b), 62 Fed. Reg. 55026, *55094 (1997).

Accordingly, it is possible that the proportionate share of Federal funds would be zero for any <u>particular</u> private school disabled student.   Arguments could be made, based upon the language and structure of the Amendments, both in favor of and against such a result.

For example, the Amendments make it clear that the "child-find" requirements of the IDEA apply to private school disabled students.  Amendments, tit.I, § 612(a)(10)(A)(ii).  Under the child-find provisions,

> All children with disabilities residing in the State, including children with
> disabilities attending private schools, regardless of the severity of their
> disabilities, and who are in need of special education and related services,
> are identified, located, and evaluated and a practical method is developed
> and implemented to determine which children with disabilities are currently
> receiving needed special education and related services.

§ 612(a)(3)(A).  On the one hand, one could argue there is no point to specifying that the child-find requirements apply to private school children, if there is no intent to provide <u>some</u> level of service to each such child.  On the other hand, the child-find provisions themselves could be interpreted to merely require the identification of each disabled child to determine who <u>currently</u> receives services, and not as an initial step towards providing services to each child so identified.

(continued...)

- 14 -

hope that the Department of Education's final regulations will provide some guidance, in the interim we leave it to the district court to initially determine the parameters of the District's obligation to Michael after June 4, 1997. In any event, the calculation of Michael's share of the "proportionate share" of the Federal funds made available to the District requires further factual findings necessitating a remand to the district court.[6]

[5](...continued)

Additionally, the proportionate share of Federal funds is apparently to be allocated by reference to the "number and location" of private school students. It is unclear why the location of such students would be relevant, if not to permit the local educational agencies to take advantage of economies of scale. On the other hand, the Act appears to address all private school students, and does not evidently contemplate that some voluntarily placed private school students will receive no services.

We express no opinion on whether a child whose proportionate share of the Federal funds in fact turns out to be zero, or a sum substantially lower than other students, could argue that his or her rights under the IDEA or, perhaps, the constitution, are violated.

[6]The District argues in its reply brief that the Fowlers lack "standing to litigate how the District allocates [Federal] funds collectively for private school students." Appellant's Reply Br. at 3. It also asserts that the district court lacks subject matter jurisdiction over the matter. Id. at 3-4. The District provides no detailed argument in support of those claims, other than to cite to virtually identical pre- and post-Amendment provisions of the IDEA dealing with the Secretary of Education's right to withhold funds from a state, which provisions do not indicate that plaintiffs such as the Fowlers lack standing or that the district court lacks jurisdiction.

The proposed regulations just issued by the Department of Education state that "[n]o private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school." § 300.454(a), 62 Fed. Reg. 55026, *55094 (1997). The regulations further state that the due process procedures, including the right to bring an action in court (i.e., the private right of action), "do not apply to complaints that [a local educational agency] has failed to meet the requirements [concerning the provision of

(continued...)

**II. Kansas Law:**

The Fowlers sought the provision of interpretive services under both the IDEA and Kansas law. "State standards that impose a greater duty to educate disabled children, if they are not inconsistent with federal standards, are enforceable in federal court under the IDEA." Seattle Sch. Dist. No. 1 v. B.S., 82 F.3d 1493, 1499 n.2 (9th Cir. 1996). In our prior panel decision, we held that under Kansas law, "construed in light of our interpretation of the federal regulations, Michael is entitled to no more than he is under the IDEA and its regulations: the provision of an interpreter on-site at [his private school] at a cost no greater than the average cost of providing hearing-impaired students with interpretive services at public schools." Fowler, 107 F.3d at 810.

While the Supreme Court's decision to vacate our prior panel decision was based upon amendments to the IDEA, its decision also necessarily vacated our holding under Kansas law. We now consider whether the IDEA Amendments affect our previous analysis of Kansas law.

Kan. Stat. Ann. § 72-5393 provides as follows:

---

[6](...continued)
services to private school children], including the provision of services indicated on the child's IEP." § 300.457(a), 62 Fed. Reg. 55026, *55095 (1997).

Thus, the proposed regulations appear to support the District's argument. They do not affect the outcome of this case, however, because the regulations are not final, and because it is unclear whether the denial of due process procedures is consistent with the IDEA and its Amendments.

- 16 -

Any school district which provides auxiliary school services to pupils attending its schools shall provide on an equal basis the same auxiliary school services to every pupil, whose parent or guardian makes a request therefor, residing in the school district and attending a private, nonprofit elementary or secondary school whether such school is located within or outside the school district. . . . Speech and hearing diagnostic services and diagnostic psychological services, if provided in the public schools of the school district, shall be provided in any private, nonprofit elementary or secondary school which is located in the school district. Therapeutic psychological and speech and hearing services and programs and services for exceptional children, which cannot be practically provided in any private, nonprofit elementary or secondary school which is located in the school district, shall be provided in the public schools of the school district, in a public center, or in mobile units located off the private nonprofit elementary or secondary school premises as determined by the school district; and, if so provided in the public schools of the school district or in a public center, transportation to and from such public school or public center shall be provided by the school district.

"Auxiliary services" include "therapeutic psychological and speech and hearing services" and "programs and services for exceptional children." Kan. Stat. Ann. § 72-5392(b). The term "exceptional children" is defined as school age persons who "differ in physical, mental, social, emotional or educational characteristics to the extent that special education services are necessary to enable them to receive educational benefits in accordance with their abilities or capacities." § 72-962(f). They include "gifted children." § 72-962(g).

As we observed in our prior panel opinion, there is no Kansas case law interpreting these statutes, and, in particular, the statute's directive to provide an "auxiliary service" at the private school site on an "equal basis" unless it cannot be "practically provided" there. We concluded before that cost is relevant to determining whether a service can be "practically provided" on an "equal basis." The District argues that, because the IDEA Amendments have rendered our interpretation of federal law "wrong," our interpretation

of Kansas law, read in light of our interpretation of the IDEA and its regulations, is also wrong. However, as we have held above, we do not view our interpretation of the IDEA prior to the 1997 Amendments, as wrong. We believe it was a reasonable interpretation of the statute and its regulations. The 1997 Amendments have changed the law, and the question now is whether our interpretation of Kansas law is inconsistent with the 1997 Amendments. We discern no inconsistency between our prior interpretation of Kansas law and the 1997 Amendments.

As indicated above, the Amendments make it clear that under the IDEA, states need not spend their own money to provide special education and related services to voluntarily placed private school students, and they need not pay the cost of education, including special education and related services, to such students to whom FAPE has been offered. Rather, their only obligation is to make available to such students a proportionate amount of their Federal funds. However, nothing prevents states from voluntarily providing more, from their own funds. Thus, we reject the argument that it is inconsistent with the 1997 Amendments for Kansas law to provide more for disabled private students than its obligations under the IDEA. And while the Fowlers argue that we have taken an unnecessarily restrictive view of the state statutes, they point to nothing which suggests that our prior analysis of the cost limitations on the provision of services at private school sites, based as it was upon a careful review of the Kansas State Plan for

Special Education Article XII and provisions in the Plan which were similar to the IDEA regulations then in effect, is erroneous.

We therefore hold, once again, that under Kansas law, Michael is entitled to the provision of an interpreter on site at his private school at a cost no greater than the average cost of providing hearing-impaired students with interpretive services at public schools. We accordingly reverse and remand the decision of the district court for further proceedings consistent with this opinion.

### III. <u>Attorney's Fees</u>:

The IDEA, prior to its amendment, permitted the award of reasonable attorney's fees "to the parents or guardian of a child or youth with a disability who is the prevailing party." 20 U.S.C. § 1415(e)(4)(B). The 1997 Amendments also permit such an award. Amendments, tit.I, § 615(i)(3). We have held that "Congress intended the term 'prevailing party' to mean the same under § 1415(e)(4)(B) as it does under 42 U.S.C. § 1988." <u>Urban v. Jefferson County Sch. Dist. R-1</u>, 89 F.3d 720, 728-29 (10th Cir. 1996). Accordingly, "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." <u>Farrar v. Hobby</u>, 506 U.S. 103, 111-12 (1992). Nothing in the 1997 Amendments suggests that this interpretation is erroneous.

We held before that the Fowlers prevailed, inasmuch as they will receive partial, if not total, reimbursement for a sign language interpreter the District initially completely refused to pay for or provide. The same result obtains up until June 4, 1997, and the Fowlers will receive a presumably lesser amount, but probably an amount still greater than zero, for the period after June 4. We therefore hold that the Fowlers are prevailing parties and we remand to the district court for a calculation of reasonable attorney's fees.

For the foregoing reasons, the decision of the district court is REVERSED and the case is REMANDED for further proceedings consistent herewith.